We'll move on to the second case of the day, Stephen Menzies v. Seyfarth Shaw and others, appeal number 18-3232. Good morning, your honors. May it please the court, Jeffrey Charco on behalf of plaintiff We need to establish a scheme to defraud and intend to defraud in the use of the wires or mail in furtherance of this scheme to defraud. All the RICO elements are pled with particularity. By its terms, Rule 9b does not require malice, intent, knowledge, or other conditions of a person's state of mind to be pled with particularity, and they can be pled generally. As the Supreme Court held in the Bridge case, a person can be injured by a pattern of mail fraud even if he did not rely on or receive any wrist representations, and none of the defendants have addressed or distinguished this case. This court's decisions in the Emory case don't impose a pleading requirement that goes beyond the elements articulated in the RICO statute. We do need to plead that there were other victims of the defendant's fraud pursuant to Judge Blakey's opinion. We did, in fact, plead that there were other victims. We're not required to plead the other victim's state of mind. We're not required to prospectively rebut an impare delico defense that they were somehow in cahoots with the promoters of this attack shelter. But you still need to plead with respect to the other defendants the particularity as to the other victims, the particularity of the fraud by the defendants. Right, and we have done that with respect to this scheme, Your Honor. This was a fraudulent scheme that was intrinsically fraudulent, and that by presenting it to any taxpayer, it was part of their scheme to defraud. It was, in fact, articulated in great detail as to the steps of this transaction. We articulated there were marketing materials prepared. We articulated there was a white paper prepared for these materials. And we articulated how this information was presented to the other victims of this scheme. Beyond saying that the other victims, the North Carolina victim, the business partner of your clients, and the Arizona victim, beyond saying that they received the same materials, which this court has said in Emory is not enough, how have you articulated what was conveyed, what fraudulent misrepresentations were conveyed to those other victims? Certainly. Your Honor, with respect to Mr. Farrington, we include specific false representations in a series of allegations in our complaint. He participated in these telephone conference calls with Mr. Menzies, paragraph 43, 62, 81, 110, 111, 115, 118, 120, 123, 124. Without just giving me paragraph numbers, I'm talking about facts. What have you pled with the 9B specificity as to fraudulent misrepresentations with respect to the business partner? They told him it was legitimate tax planning when they knew that that was not the case. They expressly described that to us. The concern that I have with Farrington while we're on, is it Sidney Farrington? Sidney, yes. Okay. Is there anything in the complaint that you can point us to to show that he went through with the tax treatment that it's plain alleged was marketed to him, but that he actually went through with the tax treatment? He went through the steps of the Urim transaction in terms of creating the trust in the same way that Mr. Menzies did. Right. Did he report it for tax purposes, though, like Mr. Menzies did? Well, Mr. Menzies did not report it, but Mr. Farrington unwound the transaction prior to filing his taxes. I know we're dealing with the four corners of a complaint here, but the absence of allegations that Mr. Farrington went through with the transaction, including for tax reporting purposes the same way, seems pretty conspicuous to me. Well, Your Honor, I think he was damaged by spending over a million dollars in professional fees for a tax scheme that the defendants knew would not result in the treatment that they intended. Perhaps, but you've got to fit that into the pattern issue, right? So he, for lack of a better term, he's got to be a valid comparator. He's got to be a comparator victim. Well, he is absolutely a comparator victim. Mr. Menzies and the other victims also paid professional fees, and those professional fees were also an element of their damages. Under mail and wire fraud, are reliance or actual loss of a target elements of the crime? With respect to civil mail and wire fraud, you would need to establish that. I'm asking about the crime. With regard to the crime. Most of your arguments are devoted to matters, most of the issues here would have equal application to criminal prosecutions. And if a scheme to defraud aims at five people and only one of them bites, that's still a scheme to defraud, right? Absolutely, Your Honor. It's still prosecutable. Absolutely, and I think this court's decision in Torres indicates that not all the victims need to rely on those statements. And I think that that's absolutely applicable under these circumstances. Could I ask you to address the PSLRA amendment to RICO? Specifically, you rely on the Ninth Circuit in Reznor and the Sixth Circuit in Owinga. I wonder if you could address the Ninth Circuit's opinion in Swartz against KPMG, which comes out the other way on this question and looks awfully close. That is, it's a scheme to conceal, go through some securities transactions to falsely inflate the basis of what would otherwise be a big capital gain. Well, I actually don't think that was the underlying investment in the Schwartz case. It was the Son of Boss case, which involved offsetting options, which are contributed to a partnership. In order to justify the economic substance of its Son of Boss transaction, there had to be an independent profit motive for those option sales. And because there were misrepresentations in connection with the possibility to get a profit on those offsetting options within the structure of the tax shelter in the Schwartz case and the Second Circuit case. Misrepresentations about the value of the security transaction. About the value of the security, the profitability of the offsetting options. As it turns out, there were documents from the promoters of the shelters that indicated that they knew that those offsetting options would never result or one in two million chance that they would result in a profit motive. So in the Schwartz case, there was a representation as to the value and nature of the securities there. And that's not the case in the Menzies case. Do you believe the test for the PSLRA is the same as the in connection with test for the statute of limitations and statute of repose issue on the Illinois securities fraud claims? Right. Is it the same test? The in connection with standard exists on both standards. There is also the requirement that the sale take place in Illinois. But yes, with respect to the in connection with test, I don't see any distinction between Illinois law and the federal law. In fact, cited in the briefs, there's a whole series of Illinois cases saying they look to the federal courts for guidance. Are the district court judge's opinions inconsistent then from the first motion to dismiss on the PSLRA and the second motion to dismiss on the Illinois statute of repose? Yes. I believe they were entirely inconsistent. I believe he went through a detailed analysis on the first opinion where he addressed the issue of whether it was actionable securities fraud rather than just related to a sale of security. And the second time, it was an offhanded comment that the complaint was replete with allegations of securities fraud. But when you break down each one of those, none of them relate to a fraudulent statement or omission in connection with the sale of any security. Can I just ask one thing that troubles me? I get the impression that you think that Mr. Menzies can recover from the defendants the amount of capital gains tax he had to pay on this game. Correct, Your Honor. I think that in the context of a tax shelter scheme, the idea is twofold. One, he didn't need to enter into this scheme and sell his company at all. And had he known the true consequences, he might have chosen not to do that. Secondly, there are alternative structures that would have allowed him to transfer his shares and still maintain the value. A tax-free reorganization would have worked that had he done that and died to taxes. In fact, he would have never paid any taxes. Really? Okay. That strikes me as a very aggressive damages theory for somebody who's alleging this was all just a corrupt bargain. In essence, you're saying my client should have had the benefit of this corrupt bargain. Some people see it that way, Your Honor. I like to see it that there were alternative structures that he could have used had he been aware of that. Or he could have held on to his shares and not had the income event that would have led to the tax liability. And, again, there are other elements of our damages. Well, he was a penalty. The fees and the penalties, I totally understand. Correct. But could you tell us what role, if any, Mr. Taylor's criminal conviction ought to play in this case and whether it has anything to do with the tax scheme involved in this case? Well, I think it's pretty clear that Mr. Taylor was solicited by the promoters here because of his long history in the tax fraud industry. And that he was somebody who was willing to issue an opinion letter. He testified. What evidence? That's a pretty broad statement that a northern trust is going to specifically seek out somebody who's been involved in tax fraud because that person's been involved in tax fraud. What possible evidence, and I know you went through a discovery, would support a broad statement like that? Well, I think the evidence in this case would be that he was, in fact, brought to the table, I don't know for certain, but perhaps by URIM for the Arizona transaction, which predated our transaction. He was provided with a- I'm not saying that they didn't seek out Mr. Taylor specifically. But you just said they sought him out because he was engaged in tax fraud, essentially. What possible allegations are in the complaint or evidence would support a pretty strong statement like that? Well, the allegations in the complaint that would support that statement would be that when he was recommended by northern trust to Mr. Menzies, he was identified as somebody who was up to speed about this transaction. That's the only specific allegation that I can think of. And based on up to speed that you can make a reasonable inference that northern trust then thought that that meant he was engaged in tax fraud and knew what he was doing in tax fraud, and therefore they brought him on? That's a pretty big inferential leap. Do I have evidence that northern trust in particular knew that Mr. Taylor had previously been involved in other tax shelters? I don't have any evidence in my complaint of that. But I don't believe it to be an incredible inference to believe that there were lawyers out there in the market that were sought after because they knew that they would sign- There generally may be. But I'm following up on your specific statement that the defendants here specifically sought out Mr. Taylor because they knew that he was good at criminal tax fraud. That's a pretty big statement to make without some evidence to back it up. Well, Your Honor, we have the testimony which came from the Copeland case in the northern district where Mr. Taylor testified, which identified the series of tax shelters that he'd been involved in. And he's been convicted. I'm not questioning that. I'm just questioning your representation of the link between the other defendants and Mr. Taylor, and specifically in response to Judge Hamilton's question about what impact his criminal conviction should play here, that we should be able to draw a reasonable inference, and you do have 9B here on top of it, that they specifically sought him out because he was engaged and was up to speed on criminal fraud. With respect to the facts of this particular case, I believe that the evidence showed that he was brought onto this particular transaction because of his relationship on the Arizona deal. That's what I understand the specific information as to that. I don't have knowledge of their prior dealings with Mr. Taylor one way or the other. And that is not alleged in the complaint. Can we go back to the pattern element for a second? Certainly. And the question that I have is, and you can correct me if I'm wrong, but an impression from reading through the complaint is you're not only focused on the Urim-Oak strategy, but you gain particular focus on the Urim-Rowan strategy when it comes to that North Carolina investor. Is that fair? That's the North Carolina invested in the Rowan, not the Oak strategy. Right. And how do we know from what you've pled that there is enough similarity, relational similarity, to the Oak strategy to fairly consider that part of the pattern? The only reason I ask it that way is because I think it doesn't surprise me at all that banks and law firms and trust companies and the like are out marketing a whole series of tax shelters. But those tax shelters, beyond that very general observation, can be very different. The tax treatment under the Rowan strategy and the Oak strategy are not the same. They don't utilize the same methods of the tax code to reach similar conclusions to shield income from taxation. That being said, the application of the enterprise of an individual tax shelter depends on the individual circumstances of those investors. And an enterprise would provide different tax shelters to different investors based on their individual needs. Okay, so then are we looking at it from the pattern or from the enterprise standpoint, that effectively the allegation is what was being peddled here were a series of fraudulent tax shelters. Oak, Rowan, and perhaps others. The Common Trust Fund is another one that I'm aware of. The Point strategy is specifically referenced as another one that Yerma was involved in. They are different sub-schemes associated with the same general scheme, to use different tax shelters based on the individual needs of individual investors. Are they all aimed at, in essence, sellers of businesses who expect to incur large capital gains liability? In my experience, reading tax shelter cases and dealing with tax shelter cases, income events such as the sale of closely held corporations are frequently a source of tax shelters. It would need to be a large income event that you would want to use a shelter for. I don't mean to put you on the spot here, but can you think of any allegations in your complaint that explain the pertinent parameters of the Rowan strategy vis-a-vis the Oak strategy? Your Honor, we identify the individual IRS notices and incorporate those in which describe what was problematic with it. I did not describe the individual steps of the Rowan transaction in the same detail as we did the Oak strategy. But your point, just from the complaint, is you've kind of incorporated the substance of it by reference because we can go look at the IRS notices. Correct, Your Honor. Okay. All right, if I could reserve the remaining time. Sure. I appreciate it. We'll hear, I think, three attorneys for the defendants. Mr. Gerringer. Good morning. May it please the Court, Matt Gerringer on behalf of Appalachia, Seyfardt Shaw, and Graham Taylor. With respect to your question about Mr. Taylor, the conviction should have no relevance. It was arising out of a 1999 transaction that was done while he was at Pillsbury Madison Asutro. It didn't involve any of these other alleged participants in the alleged enterprise here. I don't think it should have any relevance. With respect to the issue of tax shelters in general, I think we have to look at who this investor was, who this plaintiff was. He's selling a business for $64 million with a $46 million capital gain, looking to avoid any capital gains tax whatsoever. He gets an opinion that tells him only that, in Seyfardt's opinion, there's more than a 50% chance that this will be upheld if challenged by the IRS. That also means there's a 49% chance it will not be upheld. He received it based on facts that he supplied in a certificate of facts. And many of these facts are facts that were solely within his knowledge, having to do with his intent in establishing these trusts, that they were for a state planning purpose. Sir, are you wanting to argue in pari delicto on the pleadings here? Well, Your Honor, it's in part in pari delicto. It's in part going to this issue of victims, because that's kind of where I was headed next, which is we're talking about mail and wire fraud, and you asked about the elements of mail and wire fraud. We do not disagree that as a criminal matter or as a civil matter or as a predicate act, you can have mail or wire fraud without reliance or injury necessarily. However, when we're talking about the Morgan test and one of the factors of the Morgan test being the number of victims, to be a victim of a particular alleged scheme, alleged enterprise, you do have to allege that there was some injury as a result of the predicate act. There was some reliance, and that's what Emory teaches us. That's a case where there's no question, although plaintiff's counsel said in his brief that, well, the real question there was whether they'd received the letters at all. Well, that's not at all what the opinion says. Do you lead Emory to require proof of actual deception, or do you think that goes too far? Well, whether it's proof of actual deception. Allegations that would establish actual deception. I do, Your Honor, and at a minimum. How can that be a requirement that you allege sufficient facts to establish actual deception when that's not required for mail or wire fraud? Because we're talking about whether they're a victim, and whether they're a victim in terms of the number of victims we're looking at. So it's not a matter of whether it's a predicate act. It's a matter of whether there are other victims alleged, so that when we're looking at the factors under the Morgan test, the number of victims is relevant to that. Does the number of potential victims you're trolling for make a difference in this analysis? I don't think when we're talking about the factor under Morgan of the number of victims, I don't think it does, Your Honor. So think about a boiler room operation, okay? Forget about the securities exceptions, but you make a fraudulent telemarketing scheme. You make a lot of calls. Most people hang up. They don't answer. They're intended victims, right? I understand that, Your Honor. And when we're talking about the number of victims, again, for the Morgan test, I don't think that's the issue. I mean the multiplicity of the predicate acts may well be. That may well be a relevant consideration for another factor. But in this case, you know, obviously the multiplicity of the predicate acts, we're talking about mail and wire fraud. Doesn't that go more to the question of loss, what you're arguing, or injury as opposed to being an intended victim of a scheme? Because, again, nothing about mail or wire fraud requires actual deception on the part of the victim. Right, and when we talk about the Morgan test, I don't think we're talking about intended victims. I mean they talk about victims, and that's what we're talking about here. And I think that's what every good really is. So is it your position then, in order to be a victim, that the individual has to have suffered a loss, a specific monetary loss? You have to have at least relied on the alleged predicate act, in this case mail or wire fraud, or have been deceived by it in some way that led to some injury. I believe that is true. It sounds like you think that Emory and Morgan amended the statute. I'm sorry? It sounds like you think Morgan and Emory amended the statute to add a new requirement. No, I don't think so at all. Let me ask you about, it seems to me that you face the bigger problem with respect to the so-called open-ended continuity under RICO. The plaintiff hasn't emphasized the point, but they do mention in their brief that, in essence, the United States Treasury was a target of this scam. Should we take that into account as well? Your Honor, I don't think so. Whether this, in fact, I mean, obviously, plaintiff is alleging that this was a fraudulent scheme. Don't we have to take that for granted at this point? Well, in terms of that legal conclusion about that tax shelter, I don't think we do. That is a legal conclusion which this Court is not bound to accept. That has not been, there's been no judicial finding. You're also entitled to reasonable and beneficial inferences from the allegations, and that's a pretty reasonable inference from the allegations. Well, there's not been any judicial finding of that, Your Honor. No, we're here on the pleadings. I understand that completely, Your Honor, but to just say that this was all a fraudulent tax shelter and, therefore, I don't have to prove anything because it's fraudulent in and of itself, that's a little bit like Emory where they said, well, loan flipping alone is a fraudulent scheme and you can't do it and, therefore, it's all wrong. And the Emory Court specifically rejected that notion. But I think you're mixing up whether or not there's an alleged fraud scheme versus continuity or a pattern for purposes of RICO because I don't think you can dispute based on the allegations here that they have sufficiently alleged fraud. Whether or not they can prove it is a separate question. Alleged, we actually have not disputed in general that they've specifically alleged fraud vis-à-vis Mr. Menzies. Right. That's a very different issue than obviously the rest of the requirements. Correct. And I think that's where Emory is. Yeah, so if you untangle those and you focus on the pattern requirement for a second, okay? Yes. And let's focus on the allegations regarding, is it Mr. Eller that are in the complaint? The Arizona investor, yes. The Arizona investor. I mean, what's wrong with him? I mean, you look at it and talk about the Oak strategy and it's being peddled to him and there were all kinds of communications including ones that used the mail and wire and Eller went through with it and he paid X and he ended up with an IRS deficiency. I mean, what else does he need to plead? Well, again, what Emory tells us is you have to have been deceived. And when you're talking about sophisticated, this guy, it was a $75 million. What's that mean as a pleading matter though? Not as a proof, but as a pleading matter. I mean, what's it supposed to say? I talked to Eller and Eller told me he was tricked? Well, first of all, you had a year of discovery actually and he could have talked to Mr. Eller. Okay, but what does it mean as a pleading matter? What's absent from the pleading that needs to be there? Those magic words? That Mr. Eller, you know, just as in Emory, that Mr. Eller was unsophisticated. That he was unsophisticated. Or that he relied on the alleged misrepresentation. What rule of law says this has to be included in your complaint? I don't understand that at all. Because we're talking about the victims of this alleged misrepresentation, of the alleged predicate acts, of this alleged pattern. But you don't become a victim. I don't understand the sophistication point at all. If they go into this counsel, it will help if you listen to comments and questions. Mr. Menzies is very sophisticated. I agree. Right? And you just acknowledged that at least as to him and him alone, his pleading is fine. But in your view, it falls apart on the pattern element. So what difference does it make whether Eller is sophisticated or unsophisticated? Who cares? I'm sorry. If you compare the allegations about being deceived and relying on these things, those allegations are made with respect to Mr. Menzies. They actually are made. And with respect to the other investors, they're not. And I think they're kind of deafeningly not, in that these are extremely sophisticated tax shelter investors. And to not be able to make that allegation, and I think that's what Judge Blakey focused on as well, to not be able to make that allegation is telling. In the same way that Mr. Farring unwinding the transaction before claiming the tax benefit is also telling. If you're reading Emory too broadly and you do not have to plead actual deception, have they alleged enough here to meet the pattern requirement, including the other investors? I would say no, because all they've done is said this. They haven't actually alleged the content of what these folks were told. They've alleged in general that Mr. Eller, the Arizona investor, engaged in the Oak transaction, but without alleging exactly what he was told and what he was given to do. And honestly, when you're talking about people who allegedly were defrauded, I really think that is a very telling difference here. In any event, I know I have a short period of time left. I do want to touch on that. You have no time left, but what else do you want to talk about? Only in that the state law claims for Shifar Shaw have an entirely different ground that can also be a statute of limitations. Correct. That's in your briefs. Thank you, sir. Which clearly applies. All right. And then we'll next hear from Mr. Berberian for Northern Trust. Is that right? Yes, you are. Good morning, Your Honors. Nicholas Berberian. May it please the Court, on behalf of Northern Trust. I'm here to address primarily the dismissal of the common law claims under the statute of limitations based upon the Trogenza Principle, which this Court adopted in Klein, and also the alternative basis under the PSLRA. Mr. Berberian, is the district court's opinion on the first motion to dismiss addressing the PSLRA issue in RICO inconsistent with his ruling on the second motion to dismiss on the statute of limitation grounds and finding in connection with the sale of securities? There is an element of inconsistency, Your Honor. There's no question about it, but there was an entirely different element of focus. On the first go-around, we did raise the PSLRA argument. It was in connection with all of the other arguments that were raised in connection with the complaint. The second time around, because of the judge's ruling, the focus was on the pattern and RICO issues, as well as the open issue under the statute of limitations under Trogenza for the common law claims. But the second focus, I'm not talking about the RICO claims. I'm just talking about the statute of limitation for purposes of the Illinois securities claims. It seems like the issue on the PSLRA and RICO is the same as the issue on the statute of limitations for securities claims under the state. Would you agree with that? I agree with you, Your Honor, on the in connection with requirement. Yes. But what happens in terms of the divergence between the two opinions? For whatever reason, on the first opinion, the district court focused on this issue under the PSLRA on whether it had to be actionable by the plaintiff, whether the securities claim had to be actionable by the plaintiff, or had it be actionable by anyone. And you can see from the first opinion that that was the entire focus, a large part of the focus. And that did deal with the in connection with. I don't deny that, Your Honor. Absolutely. The second opinion, Your Honor, because we did not, having the decision in the PSLRA, we did not revisit that, but we did focus on the Illinois Securities Act. And that is different in this sense, Your Honor. And it is very different because it's a different framework of analysis. The framework grows out of the Trugenza decision by the Illinois Appellate Court, which was adopted and applied by this court in the Klein decision. And that is, in Illinois, as this panel is well aware, the statute of limitations under 513.205 says unless otherwise applied or unless otherwise governed, it's a five-year discovery rule. And what the Illinois Appellate Court did in Trugenza is say, well, under the Illinois Securities Act, it says any claims that are brought under that claim, under that act, or matters for which relief is granted under this section are governed by the applicable five-year, which is applicable here, period of repose. So it was decided in Trugenza by the Illinois Appellate Court back in 1997 that if it was otherwise provided for, in other words, if it could have been brought under the Illinois Securities Act, then that five-year repose period would apply. So it's a different analysis, Your Honor, in terms of where you're trying to get to. Is it statute of limitations or is it preemption under PLCORI? Right, the remedy is different. Correct, Your Honor. But the question is still, have you stated a securities fraud claim? That is correct. Yes, Your Honor, no question about it. And getting to what this court focused on, the Schwartz case, Schwartz case in the Ninth Circuit, we believe is directly on point. Right. This notion that was arched. So the district judge on this point seemed to rely on the Resner case and on the Owinga case from the Sixth Circuit, and I didn't see those mentioned. Did I miss those? Well, they were mentioned by the plaintiff on the reply, and I'd like to address those today, Your Honor, because And they were mentioned by the district judge. Well, they were mentioned, yes, Your Honor. Initially, and they're very distinguishable, and I will tell you why. The Owinga case in the Sixth Circuit involved a benefit plan where the tax deduction was taken as a result of the contribution into the plan. The plan happened to buy a variable annuity product, which is a security, but the tax, the fraud never attacks to the variable annuity, like it's attaching to the stock here. The tax fraud was in connection with taking the deduction into the plan. And Owinga, specifically, Your Honor, distinguishes itself from Swartz, where in Swartz, it was very clear, and I have the quote right from the opinion, the intended effect of these transactions was to artificially inflate Swartz's basis in the Microsoft stock so he could sell it and claim a capital loss in the amount of the difference between his inflated basis and the value of the stock. What you heard on our argument this morning about the court looking at some economic impact, I don't see in the opinion. The court was focused on the tax fraud, like it alleged is here, was designed to inflate Mr. Menzies' tax basis in his American Underwriter stock so he could sell it without any tax liability. That's what Swartz was looking at in terms of artificial inflation of basis. Steckler was looking at that in the Southern District of New York. King was looking at that in the District Court of Oregon. How about Reiner? And in Reznor, Your Honor, Nye Circuit, very different again. And Reznor also distinguishes Swartz. In Reznor, what occurred was that there was a loan that was part of the tax shelter alleged scheme. That loan happened to be collateralized by a municipal bond account. So the defendant there argued, well, there is a connection with securities because there was a pledge of securities to secure the loan that was part of the- How is there a misrepresentation or omission here in connection with the sale or purchase of a security? The alleged misrepresentation is you can sell your AUI stock, Mr. Menzies, and we've devised a way for you to sell it so you're not going to have to pay any taxes on that sale. So you're going to be able to sell it for $64 million and avoid a gain on $45 million in capital gains. That's the alleged misrepresentation in connection with the purchase or sale of security. Mr. Berberian, I will tell you that in this in connection with concept as it plays out in, let's say, SEC enforcement in Zanford, as it plays out in SLUSA preemption in the Dabbitt case, as it plays out in your arguments based on the statute of limitations, what gives me greatest pause is that what I see in your kind of use of this as a defensive measure, although the securities laws are very broad, very protective, what I don't see are plaintiffs similarly situated to somebody like Mr. Menzies going to court and succeeding in showing securities fraud in this kind of a case. Well, Your Honor, I believe the reason Your Honor may not be seeing it is because they don't want to come within the strictures of the securities laws where common law remedies or RICO in this instance give them a broader panoply of remedies. But there is nothing, Your Honor, as Your Honor correctly pointed out, the Zanford case has set the standard for civil litigation, not just SEC litigation, for in connection with through a wide swatch of cases recognizing that that standard is very, very, very broad. Right. But your use of it and the use of it in SLUSA basically seems to turn the legislation on its head by saying because this was intended to be so broadly protective of investors, this is going to be our shield against these fraud claims in other closely related contexts. Well, Your Honor, or the flip side of that is since you do have a remedy under the Securities Act because it is in connection with, you should not be permitted to go to RICO. So where do I see those cases? Well, I think you'll see them, Your Honor, if you look at wards and you look at these other cases. Where do I see it? Where do I see PLATIS relying on that broad swath, that broad interpretation of the securities laws? I think you'll see it. Successfully. You'll see it in a number of the cases that were cited, Your Honor, not only in the tax shelter area. I mean, the cycle in the RIN investment case in the Northern District. Those are instances where it's recognized that the in connection with applies to this kind of conduct. But in the DAVID case, Your Honor, or in SEC versus Zanford. But DAVID was one of these defensive cases, right?  But in Zanford, for example, the claim there was someone saying, hey, there was fraud because there was theft, and it happened to be in connection with some mutual fund sales. The mutual fund sales had nothing fraudulent about them. They just happened to be part of the scheme. So there's a specific example, Your Honor, where the Supreme Court of the United States found that it was close enough to be in connection. Isn't your theory inconsistent with the purpose behind the securities laws? The securities laws are designed to protect the market so that securities aren't sold inflated. This doesn't impact the price of the securities at all. Well, you are correct, Your Honor, but this court in Zanford, it was specifically found that the fraud did not have to affect value. And in Goldberg, in this court's decision in Goldberg, was found it did not have to affect price, quality, or suitability. And there's a large number of cases, Your Honor, in the Ponzi scheme types of environments where securities type were used. But even though it doesn't have to impact, it still has to have some implication to try to manipulate the securities market, doesn't it? Well, or the security. Or the security. Which in this case, Your Honor, what better implication is there than raising the alleged tax basis by a series of securities transactions that then allows you to avoid paying taxes? There's a direct, as the court found in Swartz, that's the linchpin of what was being done in that case. You're manipulating the security tax basis in order to get more bottom line. But that's it, you're manipulating the tax basis, not the security or the price of the security. And as those courts have found, that because you were using a security, you implicated the securities laws. And that's why I do believe it is consistent with congressional intent under the PSLRA. Why else did Congress say, hey, if you can bring a securities claim, we're not going to allow you to bring treble damages or RICO claims. So I do believe it is consistent with congressional intent, both under the PSLRA and the notion that more than just anything having to do with value of the underlying security is governed with the in connection with requirement. Anything else you wish to tell us? Thank you, Your Honor. Okay, thank you, Mr. Barbarian. Ms. Cho, for, sorry, Christiana Bank and Trust. Good morning, Your Honors. May it please the Court. Amy Cho on behalf of Christiana Bank and Trust Company. Christiana served as the trustee for various trusts involved in this transaction. And I want to use a short time to discuss the three contracts releasing Christiana from all claims alleged in this action. Ms. Cho, before you jump into that, you've raised numerous arguments, some of which may have merit, but none of them were addressed by the district court. That's correct. And the court's other rulings. That's correct. Why should we address them for the first time here without a fully developed record by the district court? There is an alternative reason why dismissal can be affirmed, and the Seventh Circuit has the authority to affirm on any alternative reasons. And so going forward, if I could discuss the specific contracts between Christiana and Menzies. Dismissal can really be affirmed by just looking at a few documents, a few of the trust documents that were attached to every motion to dismiss that Christiana filed. They were not attached to the complaint, but they were attached to all three iterations of Christiana's motion to dismiss and are in the record. They were signed by Menzies, and through three rounds of briefing on motions to dismiss and on appeal, Menzies never disputes that these agreements are authentic, that Menzies signed these agreements, or that Menzies understood these agreements. And what these agreements say, they say two very important things. The first thing they say is that Christiana has no obligation whatsoever to advise on taxes. It also says that Christiana has no obligation to provide legal advice or financial advice, but for purposes of this complaint, and most importantly, there's no obligation to give tax advice. Second, the releases, each time Christiana is asked to do a transaction, the substitution of assets, moving money on behalf of Menzies in 2003, 2004, and there's another one in 2006 that deals with the refunding of certain funds, Menzies signs a form, which contains a broad release of everything related to the transaction. So we have three releases. So in sum, Christiana has no obligation to give tax advice, and it has three releases. And Menzies appears to argue that the releases don't cover the overall tax strategy, and frankly, I'm having a hard time understanding that argument, because two of the releases relate to release claims, known claims, unknown claims, anticipated claims, unanticipated claims, that relate to or arise out of the substitution of assets. And the substitution of assets is the key to this entire tax strategy. Without the substitution of assets, there's no taxable event. And then the third release finally covers any and all further liability claim or demand in connection with the transaction described above. And above, when you read the release, everything that's detailed about the tax strategy is laid out in bulleted points from 2003 to 2006 for the sale of the stock. And so Christiana really shouldn't have been brought in this case in the first place. Thank you. Okay. Thank you, Ms. Cho. Let's see. Mr. Charco, we gave the defense a little extra time, so we put five minutes available for rebuttal here. Thank you, Your Honor. I think you were on to something here, that the United States Treasury was, in fact, a victim of this fraud, whether they're identified and find out about it or otherwise. I think the Bridge case makes it clear that the reliance element that the defendants keep talking about is not really material to any of the taxpayers here or our ability to assert a claim in any way. With respect to the other victims, I looked at the elements of the offenses, and we've fled each of the elements of the offense in terms of the other victims as required. We think there's proper notice for them to be identified as other victims of this scheme, and we think that the allegations are sufficient under the statute. Briefly, with respect to the releases that Ms. Cho talks about, this issue was all addressed in our brief. These release agreements are clearly affirmative matters that should not have been considered under a 12B6 reason. There was no reason to do that. Christiana was part of the fraudulent scheme and had an affirmative duty to advise us of what they knew about, and they didn't do so. The releases can't be categorized in the way that Christiana did. The releases on October 10th and September 1st of 2004 to substitute assets pertain only to relating to claims arising at or relating to the substitution of assets, not the broader scheme. The sale of the stock didn't take place for four more years after that fact, and we think that that means that it's not relevant. But wasn't the substitution of the assets the reason they were able to avoid the capital gains tax here? No, you needed to do every single step identified in the process in order to get the tax benefit. That's not true. It was an element of the transaction that allowed it to happen. Had you just substituted assets in a normal trust fund, it would not have provided any of the tax benefits. If you hadn't substituted assets, could they have gotten the benefit? No. So it was an element that was required to do it. Your Honor. Mr. Charco, can I ask you to go back to the point you made about the pleading, the adequacy of the pleading in your view as to the other victims? Sure. So this is where I need some help, because when I look at what you said vis-a-vis Mr. Eller, okay? Okay. That all comes up on page 42 of the complaint, around paragraph 161, 162, et cetera, correct? Correct. That's where the allegation is. So there's no question that you allege that the shelter was marketed. There's no question you allege use of mail and wire in connection with it. And you have some particulars in there with respect to dates of communications. But then what happens is you get into paragraph 164, he gets a notice, and then 165, he suffers damages. Okay. And what's missing there for me, and just help me or tell me why I'm wrong on this, is I think how was he defrauded? Paragraph 162, Your Honor, references specifically the opinion letter there that we've alleged on information and belief is consistent with the opinion letter that was provided to Mr. Menzies and Mr. Farrington. Doesn't Emory say that isn't sufficient? Absolutely not, Your Honor. In Emory, you have to think about what the nature of the fraud was. Not every refinancing of a loan is a fraud. It's only if you refinance a loan on terms that are less advantageous than your existing loan that it creates a fraudulent statement. And there was no, as a matter of proof in Emory, there was no evidence that other people had been defrauded in the same manner that Ms. Emory claims she was. But as a matter of pleading, the court found that just alleging that other victims received the same communication that the plaintiff did wasn't sufficient. Because you had to consider whether their existing loans would result in a fraud. It would only, with respect to those other victims, it would only be a fraud if their refinancing cost them more money than their existing loan. So paragraph 162, in your view, meets the, that's where the particularity lies with respect to the allegations vis-a-vis Mr. Eller. With respect to the representations to Mr. Eller that it was legitimate tax planning. But we think the very fact that they were presented with this structure that they knew to be fraudulent is sufficient. We don't need to prove that Mr. Eller relied upon it. Sorry, the Arizona investor relied upon that. And we think that that is absolutely sufficient. And if you look at Mann, the allegations are even more specific than that. With respect to Mr. Farrington, they're more specific than that. And we have at least two other victims where there are affirmative misrepresentations alleged that the court just disregarded. The district court just disregarded. I think my additional time has expired, and I appreciate the opportunity. Okay, thank you to all counsel. The case will be taken under advisement.